IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Timothy Scott McKeny, Ph.D.,

    Plaintiff,                                     Case No: 2:14-cv-2659

    v.                                             Judge Graham

Dean Renee Middleton, *et al.*,

    Defendants.

<u>Opinion and Order</u>

Plaintiff Timothy Scott McKeny, a former assistant professor at Ohio University, brings this action alleging that he was denied tenure because of his sexual orientation. McKeny asserts claims of unlawful discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983. This matter is before the court on defendant's motion for summary judgment, which in part argues that McKeny's claims are untimely. For the reasons stated below, the court agrees and grants the motion for summary judgment.

I.     **Background**

    A.     **The Parties**

Defendant Ohio University hired McKeny in 2006 as an assistant professor in the Department of Teacher Education, within the College of Education. Under the terms of his appointment, McKeny agrees to serve a probationary period not to exceed seven years, with tenure review to occur in the 2011-12 school year. (Doc. 39-1 at PAGEID 2529). During his second year at the University, McKeny signed an acknowledgement that a tenure decision would be made no later than June 30, 2012 and that his probationary period would end June 30, 2013. (Doc. 38-1 at 1715).

Defendant Renee Middleton has served as the Dean of the College of Education since 2006. (Doc. 39 at 2454). Dean Middleton is a Seventh Day Adventist and believes that marriage is defined as a lifelong union between a man and a woman. (<u>Id</u>. at 2506-07).

Defendant Pamela Benoit has served as Provost of the University since July 2009. (Doc. 42-1 at 2897). Defendant Roderick McDavis was the President of the University during the events at issue in this case. (Doc. 39 at 2248).

McKeny describes himself as "openly gay" and states that he was a member of a Lesbian, Gay, Bisexual and Transgender organization at Ohio University. (Doc. 44 at 3131). Dean Middleton states that she became aware of McKeny's sexual orientation in 2006 or 2007 when she encountered McKeny in a grocery store and was introduced his partner. (Doc. 39 at 2503). Dean Middleton attended a Department of Education diversity forum at which McKeny spoke about LGBT issues. (Doc. 14 at 530; Doc. 16 at 557). Further, McKeny and Dean Middleton had lunch about a year before McKeny made his tenure request and spoke about McKeny's partner. (Doc. 14 at 530; Doc. 16 at 557; Doc. 39 at 2135).

Neither Provost Benoit nor President McDavis were aware of McKeny's sexual orientation at the time of the events at issue. (Doc. 35 at 894; Doc. 36 at 1033).

### B. The University's Tenure and Grievance Processes

The Ohio University Faculty Handbook sets forth the tenure review process. The process begins with the departmental promotion and tenure committee. (Doc. 37-1 at 1369, § II.E.5). If the departmental committee believes that tenure should be approved, it issues a "positive recommendation" that is forwarded to the dean for consideration. (Id.). If the committee does not recommend tenure for a faculty member, "no further evaluation is required, except in the event of an appeal." (Id.).

If the dean accepts a positive recommendation from the committee, the dean shall submit a written positive recommendation to the Provost. If the dean rejects the committee's positive recommendation, the dean informs the committee's chairperson with a statement of reasons why the recommendation was not accepted. (Id. at 1369-70, § II.E.6).

When the Provost accepts a positive recommendation from the dean, the faculty member is then granted tenure. If the Provost rejects a positive recommendation from the dean, the Provost informs the committee's chairperson with a statement of reasons why the recommendation was not accepted. (Id. at 1370, § II.E.7).

When a candidate receives a denial of tenure, he may initiate "an appeal of a negative decision at the level at which the decision was made, i.e., either within the department, or at the level of the dean or of the . . . Provost." (Id. at 1371, § II.F.1). A grievance should include "one or more of the following allegations: inadequate consideration, denial of due process (including the failure to follow designated procedures), or denial of academic freedom." (Id.).

In cases where the dean denies tenure, "the faculty member must direct the appeal to the dean." (Id. at 1372, § II.F.2.b). "If the dean denies the appeal the faculty member may appeal to the

Provost." (Id.). If the Provost supports the appeal, then the matter is forwarded to the President for consideration. If the Provost denies the appeal, the faculty member may appeal to the Standing Committee on Promotion and Tenure of the Faculty Senate. If the Standing Committee supports the appeal, "the case will be returned to the dean for reconsideration." (Id.). If the dean again denies the appeal on reconsideration, the case may proceed to a formal hearing before a Special Committee of the Faculty Senate. (Id. at 1372, § II.F.2.b; id. at 1374, § II.F.7).

After a formal hearing, the Special Committee must submit a written report of its findings and its recommendation to the President. (Id. at 1375, § II.F.7.g). The President then makes a decision on the appeal within 30 days of receiving the report. (Id.).

### C. Tenure Review of McKeny

McKeny submitted a Tenure and Promotion dossier to the Department of Teacher Education on November 14, 2011. (Doc. 38-1 at 1759). On January 20, 2012, the departmental promotion and tenure committee advised Dean Middleton that it was recommending McKeny for tenure and promotion. (Doc. 39-1 at 2556).

On April 1, 2012, Dean Middleton denied tenure and promotion to McKeny. (Doc. 39-1 at 2559). The primary reason that Dean Middleton cited for her decision was McKeny's lack of sustained and quality scholarship, particularly a lack of published articles in peer-reviewed journals.

McKeny appealed Dean Middleton's decision on May 9, 2012. (Doc. 38-1 at 1877). In his appeal, McKeny asserted that his scholarship record satisfied the department's stated expectations regarding promotion to the rank of associate professor.

Dean Middleton denied the appeal on June 8, 2012. (Doc. 39-1 at 2562). She found: "The thin amount of disseminated work to a national audience, specifically in peer-reviewed ventures, [leads] me to an overall conclusion that your scholarship is insufficient to merit tenure. This finding is consistent with my original review of your dossier." (Id. at 2565-66).

McKeny appealed to Provost Benoit, arguing that Dean Middleton had not given his tenure application adequate consideration and denied him due process. (Doc. 39-1 at 2567). Provost Benoit denied the appeal on October 2, 2012. (Doc. 39-1 at 2577). She found that Dean Middleton had conducted a "thorough survey" of McKeny's research efforts. (Id.). She also found that throughout his probationary period, McKeny had been given fair warning in annual evaluations "about the need to increase [his] productivity in the area of peer-reviewed publications." (Id.).

McKeny then appealed to the Standing Committee on Promotion and Tenure of the Faculty Senate. On December 3, 2012, the Standing Committee endorsed his appeal on the grounds that

3

Dean Middleton had "offered insufficient reasons for denying you promotion and tenure." (Doc. 40 at 2623). The Committee stated that its role was not to rule on the merits of a faculty member's application for tenure, but to "examine the process by which decisions are reached." (Id.). The Committee found a "bewildering disconnect" between the recommendation of the departmental committee and Dean Middleton's decision in terms of their respective expectations for scholarship. (Id.). The Committee "return[ed] [McKeny's] case to Dean Middleton for reconsideration." (Id.).

On reconsideration on January 28, 2013, Dean Middleton adhered to her denial of tenure. (Doc. 39-1 at 2590). In reviewing the matter on reconsideration, Dean Middleton considered McKeny's original dossier, the decisions she had made on April 12 and June 8, 2012, and the decisions made on appeal by Provost Benoit and the Standing Committee. She also considered the letters McKeny had written in support of his appeal, as well as letters of support written by certain individuals who sat on the departmental promotion and tenure committee. (Id. at 2568, 2586, 2590). Dean Middleton found that there was "an absence of a sustained record of scholarship." (Id. at 2591). She noted that much emphasis had been put on a "flurry" of written work produced by McKeny right before the tenure review, but found "no evidence that the 5 manuscripts under review will result in publication." (Id.). Dean Middleton concluded, "I stand by my review that your dossier does not exemplify the typical scholarly performance" that merits a grant of tenure. (Id. at 2592).

McKeny appealed Dean Middleton's January 28, 2013 decision to the Senate Standing Committee and requested a formal hearing. (Doc. 39-1 at 2593). On March 14, 2013, the Standing Committee issued a letter to McKeny that provided in part: "At its Meeting of 13 March 2013, the members of the Senate Promotion and Tenure Committee took up your appeal, renewed after Dean Middleton, at our committee's request, reconsidered your case. The Senate Committee found that the Dean in her response of 28 January 2013 did not adequately address the issues the Committee raised." (Id. at 2606). The Standing Committee emphasized that it found a disconnect between the standards and expectations of the Department of Teacher Education and those of the Dean. Rather than grant a formal hearing, the Committee stated that it was "returning" the case to Provost Benoit "for reconsideration." (Id. at 2607).

On April 29, 2013 Provost Benoit denied the appeal on reconsideration. She found "that Dean Middleton acted within her purview on the issue of college research expectations and that there is not sufficient evidence to suggest that [the] bid for tenure and promotion was subject to inadequate consideration in the area of scholarly productivity." (Doc. 39-1 at 2615).

4

McKeny again appealed and a formal hearing was held before a Special Hearing Committee of the Faculty Senate on October 24, 2013. On November 1, 2013, the Hearing Committee notified President McDavis that it had concluded that Dean Middleton had given the tenure application inadequate consideration. (Doc. 39-1 at 2610). The Committee found that Dean Middleton's standard for scholarship unduly focused on publication and did not square with the Department's "broader, more inclusive definition of scholarship." (Id. at 2612). Because the Committee believed that the standard for scholarship should originate on the departmental level, it recommended that McKeny be granted tenure and promotion.

On November 26, 2013 President McDavis rejected the recommendation of the Hearing Committee and denied McKeny's appeal. (Doc. 39-1 at 2617). President McDavis found that the Department of Teacher Education had provided McKeny with annual evaluations in 2007, 2009, 2010 and 2011 that emphasized the need for McKeny to improve his scholarship in the area of refereed journals because "publications in these outlets are the most highly valued." (Id.). He found that the "Department's emphasis on the importance of peer-reviewed publications as stated in the annual evaluations is not inconsistent with the Dean's assessment of [McKeny's] scholarship." (Id. at 2618).

In early December 2013 the Chair of the Faculty Senate privately approached President McDavis and asked him to reconsider his decision. (Doc. 39 at 2265-66). On December 20, 2013 President McDavis wrote to the Chair, "I disagree with the Hearing Committee's conclusion that the record in this case shows 'the application of two completely incompatible sets of criteria.' Peer-reviewed publications occupy a prominent place in the Department's policy . . . . I am standing by my original decision to deny the appeal." (Doc. 39-1 at 2621).

### D. EEOC Charge and this Lawsuit

On August 18, 2014 McKeny filed a charge of discrimination with the Equal Employment Opportunity Commission and Ohio Civil Rights Commission. (Doc. 14-17 at 761; Doc. 44-1 at 3132, ¶ 5). McKeny asserted that he was denied tenure by President McDavis on November 26, 2013 because of his sexual orientation and "non-religious," agnostic beliefs. (Doc. 14-17 at 761). The EEOC issued a Notice of Right to Sue on September 30, 2014. (Doc. 14-18 at 762).

McKeny filed this suit on December 18, 2014. He later amended his complaint and asserted claims of discrimination under Title VII and § 1983, as well as various state law claims. The amended complaint alleges that McKeny, in being denied tenure, was discriminated against on the basis of his sexual orientation and his agnostic beliefs.

5

The court granted in part a motion for judgment on the pleadings filed by defendants. The court granted the motion in the following respects: (1) the Title VII claims against the individual defendants, see Griffin v. Finkbeiner, 689 F.3d 584, 600 (6th Cir. 2012) ("An individual cannot be held personally liable for violations of Title VII."); (2) the § 1983 claims against the individual defendants in their individual capacities because McKeny's filing of a claim in the Ohio Court of Claims constituted a waiver of the right to file a federal cause of action under § 1983 against the individual defendants based on the same conduct, see Leaman v. Ohio Dep't of Mental Retardation & Development Disabilities, 825 F.2d 946, 951-52 (6th Cir. 1987) (en banc); and (3) all of the state law claims because Ohio University is immune from liability under the Eleventh Amendment and because the Ohio Court of Claims determined that there had not been a conditional waiver of sovereign immunity with respect to the individual defendants because they had acted within the scope of their employment in denying tenure to McKeny, see O.R.C. § 2743.02(A)(1), McCormick v. Miami Univ., 693 F.3d 654, 665 (6th Cir. 2012).

The court deferred consideration of other aspects of the motion for judgment on the pleadings, finding that a determination as to the timeliness of the Title VII and § 1983 claims would require an examination of evidence extrinsic to the pleadings.

The matter is now before the court on defendants' motion for summary judgment. Defendants argue that plaintiff's remaining claims are untimely, that sexual orientation is not a protected class for purposes of Title VII and § 1983 and that the evidence does not support an inference that tenure was denied to McKeny because of his sexual orientation or agnosticism.

## II.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

#### A. Title VII

The complaint alleges that defendants denied plaintiff tenure and promotion in violation of Title VII. Defendants argue that the Title VII claim is barred because plaintiff failed to timely file a discrimination charge with the EEOC. In a state like Ohio with its own employment-discrimination laws, a plaintiff must file a complaint with the EEOC within 300 days of an unlawful employment action in order to then bring a Title VII suit. Amini v. Oberlin Coll., 259 F.3d 493, 498 (6th Cir. 2001).

The parties dispute when the 300-day period began to run. Defendants contend that the allegedly unlawful action occurred on April 1, 2012, when Dean Middleton first denied McKeny's application for tenure and promotion. Defendants reason that Dean Middleton's first decision stood as a final decision for purposes of McKeny being able to initiate the University's grievance

7

procedure. Defendants rely on Delaware State College v. Ricks, 449 U.S. 250 (1980), for the proposition that the outcomes of grievance procedures are not independently cognizable employment actions.

Plaintiff argues that President McDavis's November 26, 2013 rejection of his appeal was the unlawful employment action which started the 300-day period. Plaintiff argues that the decisions made earlier by Dean Middleton and Provost Benoit were not final because the Senate Standing Committee and Special Hearing Committee found flaws in those decisions and started a *de novo* tenure review process that culminated in a final decision by President McDavis. Plaintiff relies on Reid v. University of Michigan, 612 F.Supp. 320 (E.D. Mich. 1985), where the court held that the 300-day period would begin anew where the university, upon finding "irregularities" in the original tenure review, caused the decision-making process to "proceed *de novo*." Reid, 612 F.Supp. at 324.

Defendants correctly state the rule regarding which step of an adverse tenure review process constitutes the unlawful employment action under Title VII. In Ricks, the Supreme Court held that the limitations period for filing an EEOC charge commenced at the time "the tenure decision was made and Ricks was notified." 449 U.S. at 259. The Court found that the outcome of an appeal did not restart the limitations period or amount to a continuing violation:

> It is apparent, of course, that the Board in the June 26 letter indicated a willingness to change its prior decision if Ricks' grievance were found to be meritorious. But entertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made.
>
> . . . [W]e already have held that the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods. Electrical Workers v. Robbins & Myers, Inc., 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976). The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made. Cf. id., at 234-235, 97 S.Ct. at 446.

Id. at 261 (emphasis in original) (footnotes omitted). See also Lever v. Northwestern Univ., 979 F.2d 552, 556 (7th Cir. 1992) ("An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination. If it were, then an employee could avoid the 300-day limit by filing a series of appeals or fresh requests . . . .").

A straightforward application of Ricks and its progeny to the case at hand leads to the conclusion that Dean Middleton's April 1, 2012 denial of tenure is the allegedly unlawful

employment action which triggered the 300-day EEOC filing period. Under the University's Faculty Handbook, once the tenure process begins with the departmental promotion and tenure committee, the first denial of tenure is an appealable decision, regardless of which level the denial occurs at – departmental, Dean or Provost. A Dean's denial of tenure is non-tentative and self-effectuating. That is, unless a candidate seeks relief through the appeals process, the Dean's decision stands. See Haeberle v. Univ. of Louisville, 90 Fed. App'x 895, 902 (6th Cir. 2004) (Gibbons, J., concurring) (rejecting an argument for delayed limitations period where plaintiff "was clearly seeking review of a non-tentative decision . . . rather than trying to influence initial decision-making about whether he should receive tenure"); Lever, 979 F.2d at 555 (holding that limitations period began to run when the dean made a decision to deny tenure because that decision was "self-effectuating and stands unless reversed"); Kouassi v. West. Ill. Univ., No. 13-cv-1265, 2015 WL 2406947, at *17 (C.D. Ill. May 19, 2015) ("[T]he limitations period for filing with the EEOC begins ticking at the initial denial of tenure rather than at the point when an unsuccessful tenure candidate loses an appeal.").

  This is not a case in which plaintiff lacked either notice of the Dean's tenure decision or certainty as to the effect of the decision. Plaintiff received immediate notice of Dean Middleton's April 1, 2012 denial of tenure. Cf. Harris v. Ladner, 127 F.3d 1121, 1124 (D.C. Cir. 1997) (distinguishing Ricks where, at the Rule 12(b)(6) stage, plaintiff alleged that she was not properly notified of the tenure decision). And the Faculty Handbook both established procedural rules, followed by the University in this case, by which tenure decisions were made and clearly delineated the tenure review process from the grievance process. Cf. Carpenter v. Bd. of Regents of Univ. of Wisconsin Sys., 529 F.Supp. 525, 531 (W.D. Wis. 1982) (distinguishing Ricks where university regulations left unclear what effect the dean's denial of tenure had).

  Plaintiff's own conduct during the process demonstrated his understanding of the rules and the effect of Dean Middleton's April 1, 2012 decision. On May 9, 2012, plaintiff notified Dean Middleton as follows: "I am appealing the denial of my application for tenure and promotion . . . ." (Doc. 38-1 at 1877). Dean Middleton was the individual to whom the Faculty Handbook required plaintiff to appeal. Plaintiff's notice continued, "I have . . . crafted this appeal to demonstrate strong evidence that supports the development of my scholarship across my probationary period . . . . [I] respectfully urge you to reconsider your decision regarding my application and tenure to the rank of Associate Professor." (Id. at 1885-86).

  When Dean Middleton denied his appeal on June 8, 2012, plaintiff followed the Faculty Handbook in next taking his appeal to Provost Benoit and then to the Standing Committee.

9

Throughout the process he labeled his entreaties as an "appeal" and couched his arguments in terms of the "inadequate consideration" and "denial of due process" language identified in the Handbook as grounds for appeal. (Doc. 38-1 at 1877; Doc. 39-1 at 2567-76, 2578-2586). He referred to Dean Middleton's April 1 decision as "the original denial" and to her June 8 decision as "her appeal denial letter." (Doc. 39-1 at 2568, 2574). Consistent with the Handbook's grievance procedural rules, McKeny asked the Standing Committee to endorse his appeal and return his case for "reconsideration." (Id. at 2586).

Provost Benoit and the Standing Committee used correspondingly consistent language in referring to plaintiff's "tenure appeal," discussing the inadequate consideration and due process arguments, and, in the Standing Committee's case, endorsing the "appeal" and returning it for "reconsideration." (Doc. 39-1 at 2577; Doc. 40 at 2624).

Plaintiff argues that the Standing Committee's December 3, 2012 decision endorsing his appeal broke the series of negative tenure decisions and caused the process to begin *de novo*, thereby making his EEOC filing timely. In support, plaintiff relies on Reid. The court, however, rejects this argument for two reasons. First, the circumstances presented in this case are unlike those in Reid. Second, even if the court found that the process began *de novo*, the result would be that Dean Middleton's third denial of tenure (and not President McDavis's later denial of the appeal) triggered the 300-day period and thus plaintiff's EEOC filing would still be untimely.

In Reid plaintiff alleged that individuals at the university sabotaged her tenure application by making false accusations of sexual misconduct against her, leading to a denial of tenrue. A committee reviewing her grievance found that because of the "exceptional nature" of what had occurred, a departure from the regular tenure review procedures was warranted. Reid, 612 F.Supp. at 322. The committee recruited reviewers from outside of the university to begin a new tenure review process. The external review committee recommended that tenure be denied, and a university decision-maker endorsed their recommendation. The court found that because the university departed from the normal grievance procedure and had ordered a *de novo* tenure review before an external committee, the second denial of tenure triggered a new 300-day limitations period. Id. at 324.

Plaintiff here contends that the Standing Committee found flaws in the original tenure review process, as the grievance committee in Reid did. This is true. The Standing Committee found "a bewildering disconnect" between Dean Middleton's standards and expectations and those of the Department of Teacher Education. (Doc. 40 at 2623). But what the Standing Committee did

10

next is what distinguishes this case from Reid. The Standing Committee, upon endorsing the appeal, followed the Handbook's instruction for the next step in the appeals process by returning the case to Dean Middleton for reconsideration. (Doc. 37-1 at 1372) ("If the Standing Committee . . . supports the appeal, the case will be returned to the dean for reconsideration."). In Reid the grievance committee, upon endorsing the appeal, found that the regular procedures could not be followed and it called upon new decision-makers to evaluate afresh the merits of the tenure application. Here, the Standing Committee did not instruct Dean Middleton to "start over" or act with "a blank slate"; it instead commented on a perceived difference in standards used by the Dean and by the Department and asked her to reconsider her decision in light of those comments. Upon having the Standing Committee return the case to her, Dean Middleton did not give it *de novo* treatment but rather handled it as a matter of reconsideration. Though she reviewed the filings that plaintiff, Provost Benoit and the Standing Committee made during the appeal, she did not consider any new documents in reviewing plaintiff's dossier, and she decided to "stand by" her original decision that plaintiff's scholarship did not merit a grant of tenure. See Seoane-Vazquez v. Ohio State Univ., No. 2:10-CV-622, 2012 WL 6138661, at *13 (S.D. Ohio Dec. 11, 2012), *aff'd*, 577 Fed. App'x 418 (6th Cir. 2014) (" . . . [The hearing panel's] decision was not in and of itself a *de novo* review. The hearing panel did not, for example, solicit new letters from external reviewers, order the compilation of a new dossier, debate Seoane's research, and then dismiss his complaint. The role of the hearing panel in this matter fits precisely into the grievances or appeals contemplated by Ricks, as a review that merely failed to remedy a prior decision."); Kouassi, 2015 WL 2406947, at *17 ("[T]he initial denial of tenure constitutes an adverse employment action for the purpose of Title VII, even if a university subsequently reconsiders its decision.").

Moreover, the grievance steps that followed Dean Middleton's January 28, 2013 adherence to her original decision did not constitute a *de novo* review. The Standing Committee arguably varied from the Handbook in next referring the case back to Provost Benoit rather than straight to a formal hearing before a Special Committee. (Doc. 37-1 at 1372, § II.F.2.b (providing that a formal hearing follows a Dean's denial on reconsideration)). However, the request made by the Standing Committee to Provost Benoit was not to review the matter *de novo*, but to give the matter a "second look" on "reconsideration." (Doc. 39-1 at 2607). This added layer of review of plaintiff's appeal did not re-start the 300-day filing period, see Ricks, 449 U.S. at 505-06, nor did it provide grounds for equitable tolling, contrary to plaintiff's suggestion otherwise. See Lever, 979 F.2d at 556 ("Excessive

kindness in providing many and varied opportunities for internal review is not the sort of deception that supports equitable estoppel.").

Likewise, the formal hearing and report that followed did not provide *de novo* review. Plaintiff emphasizes that in granting a formal hearing the Standing Committee found "anomalies" in the tenure process – a term that resembles the "irregularities" in Reid. The Committee used that word to describe the "misalignment of expectations" between Dean Middleton and the Department of Teacher Education. (Doc. 39-1 at 2608). But again, unlike in Reid, the resulting action taken by the Standing Committee was not to begin the tenure process anew but to advance plaintiff's appeal to the next step of a formal hearing and a report and recommendation to the President.[1] Upon receiving the report, President McDavis rejected the Special Committee's recommendation and "concluded that the appeal should be denied." (Id. at 2617).

Finally, even if the court were to find that the Standing Committee caused a new tenure decision to be made, plaintiff's claim would still be untimely. If there were a point at which the tenure review was "reset," it would be when the Committee first announced that it had found a flaw in the review process. This occurred when the Committee endorsed plaintiff's appeal on December 3, 2012 and instructed Dean Middleton to reconsider her decision. From that point forward, the Committee simply repeated its reasoning about the flaw in the process whenever it endorsed plaintiff's appeal, and the parties became entrenched in their positions. Once Dean Middleton issued her decision on reconsideration on January 28, 2013, plaintiff waited for a year-and-a-half to file his EEOC charge on August 14, 2014.

Plaintiff laments that the 300-day filing period should start with the President's denial of his appeal because "initiating litigation [sooner] would be completely at odds with extensive case law demanding exhaustion of administrative remedies." (Doc. 44 at 3119). This concern was rejected in Ricks: "It is true that the filing of a lawsuit might tend to deter efforts at conciliation. . . . But this is the natural effect of the choice Congress has made . . . in explicitly requiring that the limitations period commence with the date of the 'alleged unlawful employment practice,' 42 U.S.C. § 2000e–

---

[1] A determination that the Standing Committee, upon finding anomalies in the process, caused the Special Committee and President McDavis to render a *de novo* tenure decision would not save plaintiff's claim in any event. Dean Middleton and Provost Benoit did not participate in that part of the process, and plaintiff has pointed to no evidence that President McDavis had any knowledge of plaintiff's sexual orientation or agnostic beliefs. Plaintiff merely states that President McDavis "admittedly knew Dean Middleton was a Seventh Day Adventist" (Doc. 44 at 3102), a point that alone fails to support a reasonable inference that President McDavis acted with discriminatory animus against plaintiff.

5(c)." Ricks, 449 U.S. at 259 n.11 (internal citations, quotation marks and alteration omitted). See also Lever, 979 F.2d at 555 ("It may well be that Lever did not want to cry 'discrimination!' while there was still an opportunity to obtain a favorable decision from the University. But Professor Ricks had the same legitimate concern . . . . If the Dean was holding Lever's sex against her, the unlawful practice occurred on May 5, 1980, when the Dean turned her down for promotion.").

Accordingly, the court finds that plaintiff's Title VII claim is time-barred.

### B. Section 1983

The complaint asserts a claim under § 1983 on the grounds that defendants violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in denying him tenure and promotion. As it did with the Title VII claim, the complaint identifies the denial of tenure and promotion as the allegedly unlawful action. (Doc. 14 at 547, ¶ 95 (alleging that defendants violated plaintiff's right to equal protection "by not recommending Plaintiff for tenure and promotion due to his sexual orientation").

Defendants argue that plaintiff's § 1983 claim is time-barred. The statute of limitations for a § 1983 action arising in Ohio is two years. Banks v. City of Whitehall, 344 F.3d 550, 553 (6th Cir. 2003) (citing Browning v. Pendleton, 869 F.2d 989 (6th Cir. 1989) (en banc)). The "limitations period begins to run when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred." Cooey v. Strickland, 479 F.3d 412, 416 (6th Cir. 2007) (internal quotation marks omitted). The Sixth Circuit has held that a court should "look at when the harm in question occurred" and "look to the event that should have alerted the typical lay person to protect his or her rights." Id. (internal quotation marks omitted); see also Sevier v. Turner, 742 F.2d 262, 273 (6th Cir. 1984) ("A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence.").

The harm complained of by plaintiff is the denial of tenure. As explained above, the court finds under Ricks that this allegedly unlawful action occurred when Dean Middleton denied tenure on April 1, 2012. Although the claims in Ricks arose under Title VII and § 1981, the Court's holding – as to which point in the tenure review process the actionable conduct occurs – applies as well to § 1983 claims. See Haeberle, 90 Fed. App'x at 898 (stating that "Ricks controls" in determining when a § 1983 claim accrued in the denial of tenure context); see also Kessler v. Bd. of Regents, 738 F.2d 751, 754-56 (6th Cir. 1984) (in a non-tenure case, applying Ricks to a § 1983 claim for the principle that "the existence of a grievance procedure does not change the importance of" the date of injury in determining when the cause of action accrued); JiQiang Xu v. Michigan State

Univ., 195 Fed. App'x 452, 456 (6th Cir. 2006) (in a non-tenure case, applying Ricks to a § 1983 claim for the principle that the "key date for the accrual of the limitations period is the injury, not the completion of any grievance process").

Plaintiff filed his complaint on December 18, 2014. Because he waited for over two years after Dean Middleton's April 1, 2012 denial of tenure to file suit, his § 1983 claim is time-barred.

Without elaboration, plaintiff asserts that even if his claim based on the denial of tenure is time-barred, "there are still actions by [the individual defendants] . . . which are independently actionable." (Doc. 28 at 806; Doc. 44 at 3119). Presumably, he is referring to the decisions to deny his appeal. This proposition is contrary to Ricks – the harm to plaintiff is the denial of tenure, not the denial of his grievance. See also Lever, 979 F.2d at 556 ("[W]hen the first decision is connected to and implies the second – when, in other words, a single discriminatory decision is taken, communicated, and later enforced despite pleas to relent – the time starts with the initial decision.").

Even if the court were to accept plaintiff's proposition, it would not save his claim against any of the defendants. If Dean Middleton or Provost Benoit acted with discriminatory animus in denying plaintiff's appeal, they would have inflicted that injury, and plaintiff would have been first alerted, on June 8 and October 2, 2012, when they respectively made their initial decisions to deny his appeal. Their later denials at subsequent steps of his appeal were not fresh acts of discrimination but were restatements of their refusal to grant plaintiff's grievance. Thus, plaintiff's claims against Dean Middleton and Provost Benoit are time-barred even if those claims accrued when they first refused to grant his grievance.

President McDavis denied plaintiff's appeal on November 26, 2013, within the two-year limitations period. However, as noted above, plaintiff has submitted no evidence which supports an inference that President McDavis knew of plaintiff's sexual orientation or agnostic beliefs, let alone that President McDavis acted with discriminatory animus.

Accordingly, the court finds that defendants are entitled to summary judgment as to plaintiff's § 1983 claim.

## IV. Conclusion

For the reasons stated above, defendant's motion for summary judgment (doc. 41) is granted

for the reason that the claims are time-barred.

s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: March 16, 2017